UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

UNITED STATES OF AMERICA,

                                                    DECISION AND ORDER
            v.                                              99-CR-002A

DAVID WILLIAMS,

                    Defendant.

═══════════════════════════════

## **BACKGROUND**

Defendant David Williams was indicted in January 1999 on charges that
he was a principal administrator in a continuing criminal enterprise and was
alleged to be one of the largest cocaine suppliers in Buffalo, New York.  The
indictment also included allegations of drug trafficking, using a firearm to
facilitate drug trafficking activity, using a telephone to facilitate drug trafficking
and being a felon in possession of a weapon.[1]  The indictment named 29 others
in various drug-related charges, including Mark Overall, Dawood Naseer and
Alvin Jackson.

Williams retained attorney Anthony Leonardo to represent him.  Leonardo
had previously represented Williams on earlier federal drug charges.  As it turns

───────────────────────

[1]  Some of these charges were added later pursuant to a superseding indictment.

out, Leonardo was involved in illegal activity that included selling illegal firearms, money laundering, cocaine distribution and conspiracy to commit murder. Some of Leonardo's criminal conduct involved Williams. The government first learned about allegations of illegal conduct from Mark Overall in March 1999 but did not move to recuse Leonardo because the allegations were uncorroborated at that point. As pretrial proceedings progressed, the government learned more about Leonardo's illegal conduct and ultimately, in December 2000, Leonardo was arrested. In early February 2001, attorney Gary Greenwald was substituted as counsel for Williams.

In August 2001, Williams moved (through new counsel) to dismiss the indictment asserting that his Sixth Amendment right to counsel was violated as a result of Leonardo's conflict of interest. This Court denied the motion and the case proceeded to trial. On December 14, 2001, a jury found Williams guilty of: (1) engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) and (b); (2) conducting a financial transaction involving the proceeds of unlawful activity with the intent to promote unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (ii); (3) possessing with intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); (4) possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) and (2); and (5) four counts of using a telephone while committing a drug trafficking crime, in violation of 21 U.S.C. § 843(b). Under the

then-mandatory guidelines regime, Williams was sentenced to life imprisonment for the first and third counts, a consecutive term of 5 years' imprisonment on the fourth, and a concurrent term of 20 years' imprisonment on the remaining offenses.

Williams appealed his conviction and sentence to the United States Court of Appeals for the Second Circuit and reasserted his Sixth Amendment claim on appeal. In June 2004, the Circuit found that Williams' Sixth Amendment right to counsel was violated because his attorney was burdened by an actual conflict of interest that adversely affected counsel's representation. The Circuit found that a lapse in representation occurred when Leonardo failed to make any significant effort to negotiate a plea disposition on Williams' behalf, and actively discouraged Williams from cooperating, out of fear that his own criminal conduct might be revealed. The Circuit found that Williams was denied conflict-free counsel during the "critical months after [his] arrest when [he] asserts that he had valuable information that he could have offered the government concerning [the whereabouts of fugitive codefendant Alvin Jackson]." See United States v. Williams, 372 F.3d 96, 106 (2d Cir. 2004).

Having determined that Williams' representation was marred by an actual conflict, the Circuit determined that neither dismissal of the charges or a new trial was warranted. Instead, the Circuit found that the appropriate remedy was to resentence Williams to the sentence he would have received had he been

given conflict-free advice.  Id. at 111.  Although the government represented to the Circuit "that it would not have consented to a sentence short of life imprisonment," the Circuit declined to take the government's "hardline bargaining position at face value."  Id.  at 107.  Rather, the Circuit directed this Court to "gather any evidence needed to reconstruct the likely result Williams would have obtained had he not had conflicted counsel" including inquiry into "the terms of the agreement the defendant could have received, whether [he] would in fact have accepted the plea, and . . . whether [the] court would have followed the sentencing recommendations contained in the agreement."  Id. at 111 (internal quotations omitted).  In so holding, the Circuit cautioned that "it is possible that Williams' sentence ought not to be reduced" if this Court were to determine that "even if Williams had constitutionally effective counsel after his arrest, the same sentence would have eventuated."  Id.

In accordance with the remand, this Court held an evidentiary hearing on February 13th through 16th of 2007, and the hearing continued on April 28th, April 30th and May 1st of 2008.  Following the hearing, the Court directed the parties to brief the following issues:

(1)     whether the defendant would have been able to obtain a favorable plea offer from the government had he been represented by conflict-free counsel during the pretrial proceedings and if so, what the terms of that offer would have been;

(2)     whether the defendant would have accepted that plea offer; and

(3)     whether it is likely that this Court would have sentenced the defendant in accordance with the terms of that plea deal.

The parties filed their respective briefs and the Court held oral argument on December 16, 2009.[2]

For the reasons stated, the Court finds that, even if Williams had been represented by conflict-free counsel immediately after his arrest, any plea offer made by the government would have required the defendant to agree to a sentence of life imprisonment, and the defendant would not have been willing to accept that offer.

## DISCUSSION

I.     **Whether Conflict-Free Counsel Would Have Achieved a Favorable Plea Offer**

The government claims that even if the defendant had been represented by conflict-free counsel at the outset, any plea offer would have required Williams to agree to a life sentence.  Upon review of the evidence presented at

---

[2]  The mandate issued on July 1, 2005.  Shortly thereafter, the Court held a status conference to discuss the appropriate procedure following remand.  At first, the parties attempted to resolve the issue without a hearing but when it became clear that the a hearing would be necessary, the parties submitted briefs addressing the scope of the hearing and the issues to be addressed.  The Court permitted defense counsel the opportunity to obtain discovery material necessary to support its position, which contributed to the delay.  Also, numerous adjournments were granted, some at the request of defendant's attorney.  After the hearing concluded, the Court required further briefing and oral argument.  There was also a delay in the proceedings while the Court considered whether the need for a hearing had been mooted in the wake of United States v. Booker, and its progeny.  Ultimately, the Court determined that the hearing was not mooted and held oral argument on December 16, 2009. The matter was deemed submitted at that point.

the hearing and having the opportunity to observe the demeanor of the witnesses, the Court is persuaded by the government's position.

AUSA Joseph M. Guerra, the lead prosecutor in the case against Williams and the head of the Narcotics Criminal Division of the United States Attorney's Office for the Western District of New York ("WDNY USAO"), testified that the indictment against Williams was the culmination of a one-and-a-half year investigation undertaken jointly between the DEA and the FBI. That investigation revealed that Williams was the largest distributor of cocaine and cocaine base in the Buffalo area, heading up a drug distribution ring that sold massive drug quantities. Guerra testified that the evidence against Williams was strong from the outset, and included: (1) evidence that Williams had provided 40 to 50 kg of cocaine to another major drug dealer named Tyrone Brown; (2) the seizure of 12 kg of crack cocaine having a street value of $250,000; (3) fingerprint evidence tying Williams to the drugs; (4) the seizure of approximately $422,000 in cash from a person named Oscar Baker to be used to buy cocaine in Florida on Williams' behalf; and (5) wiretap evidence implicating Williams in drug trafficking activity. The evidence also indicated that Williams had been engaged in his drug trafficking for many years, including while he was on supervised release for a prior federal drug trafficking conviction. The day after the indictment was unsealed and Williams was arrested, more evidence against him was discovered including drug paraphernalia and firearms at his residence

at 22 Interpark, Buffalo, New York, cocaine residue and drug paraphernalia at a residence next door, 26 Interpark, that Williams controlled, and the seizure of a large quantity of guns and cash from a Florida residence tied to Williams.[3]

Guerra testified that even if Williams had been represented by conflict-free counsel at the outset, no plea offer would have been made and any plea agreement would have required Williams to agree to serve life imprisonment. In addition to Williams' massive drug distribution network, the government believed that he was responsible for several shootings, including a shooting done in retaliation for an attack against Williams and a shooting committed where a child of the intended victim was accidently killed. (See Gov't Exh. 16-18). The government was also aware that one of Williams' codefendants, Willie Inabinett, had committed suicide when federal agents tried to arrest him and another codefendant had told Guerra that Inabinett did because he feared testifying against Williams.

The Court found Guerra's testimony very credible. His testimony as to the strength of the government's case against Williams and his role as the leader of the drug distribution ring was supported by numerous exhibits showing that Williams was, at that time, the largest cocaine dealer in the Buffalo area. There was also evidence supporting Guerra's testimony that he believed Williams to

---

[3] Williams' daughter, Shanique Williams, was living in the Florida residence at the time, which was owned by codefendant Alvin Jackson.

have been responsible for several homicides. Although Williams disputes that he had any role in those homicides, whether he did or not is beside the point. The issue is whether the government *believed* Williams to have been involved in those homicides so that any plea would have required Williams to serve life. At the hearing, the government introduced FBI and DEA reports prepared during the investigation against Williams showing that both DEA and FBI agents believed Williams was involved in those shootings. This evidence supports the government's contention that it perceived Williams to be a dangerous kingpin. Likewise, documents produced at the hearing corroborated Guerra's testimony that the evidence against Williams was strong from the outset and therefore the government neither needed nor desired his cooperation.

Counsel for Williams asserts that he could have enticed the government to move off its "hardline position" with an offer of cooperation against other defendants. To the extent that Williams would have been willing to cooperate against lower-level codefendants, the Court is persuaded that the government would not have been willing to negotiate a deal to that effect. It was against DOJ policy and the policy of the WDNY USAO to permit Williams, the lead defendant, to cooperate against lower-level codefendants. In fact, consistent with those policies, the WDNY USAO sought to have lower-level defendants testify against Williams, not the reverse, so as to ensure that each defendant received a sentence consistent with his or her relative culpability.

Williams argues that he could have offered helpful cooperation against equally-culpable defendants in exchange for a plea of less than life imprisonment.  For example, the defendant asserts that he could have provided the government with information concerning the whereabouts of codefendant Alvin Jackson, who was a fugitive at the time.  Williams also asserts that he could have provided the government with information about the criminal activities of his former attorney, Anthony Leonardo, and with information about Calvin Cornelius, another large scale drug dealer in the Western New York area.

Based upon the credible evidence adduced at the hearing, the Court finds that the government was simply not interested in cooperation from David Williams.  From the beginning, Williams was the primary target of the investigation (named "Operation Dog Pound" based upon Williams' nickname as "Dave Dog"), and the government's main objective was to have Williams incarcerated for life and to take down his drug organization.  When asked whether he would have been willing to permit Williams to cooperate against other defendants in exchange for a lighter sentence, Guerra testified:

> Based on everything that I knew in the investigation and what I believed to be the . . . reasonably available avenues of cooperation for Mr. Williams, there was nothing that would be presented to me that would change my position that he should be subject to life imprisonment.

(See Dkt. 1039, at 218).  When asked specifically whether he would have

9

offered Williams a plea deal in exchange for information about the whereabouts

of codefendant Alvin Jackson, Guerra testified that if conflict-free counsel had

approached him with such an offer of cooperation:

> I would have told the attorney that before you give me any
> information that my position [in] this case [is that] it was designed to
> achieve a life sentence for Mr. Williams. I would not come off that,
> and [let] the attorney decide what the attorney wanted to do with
> respect to Alvin Jackson's information.
>
> If there w[ere] further discussions I would have– it would have been
> my practice to say, well, fine, if Mr. Williams wants to agree to a life
> sentence we allow the benefits of any of his cooperation to go to at
> that point Shawn Jones who we believed to be one of his girlfriends
> as well as to his daughter, Shanique Williams, although not
> charged, was found in the house in Florida in which there were a
> large quantity of guns and money and other items found.

(Id. at 158).

Guerra's testimony was consistent with other evidence adduced at the

hearing, including the testimony Denise O'Donnell, the United States Attorney

for the Western District of New York during the Williams prosecution. O'Donnell

testified:

> My view was that Buffalo has the highest rate of violent crime in this
> state and has for a long time, between Buffalo and Rochester. It's
> fueled by the drug trade. I felt that David Williams was responsible
> for that drug trade in Western New York for a significant amount of
> it, including violence, including widespread distribution of crack
> cocaine in my community.
>
> I felt that we had, over a period of time, developed evidence to
> convict him of a continuing criminal enterprise for his role, and I
> thought it was my responsibility to see that that was done and to
> seek the maximum penalty against him.

(See Dkt. 1072, at 70). Therefore, if conflict-free counsel had approached her on "day two" after Williams was arrested, she would have rejected his offer of cooperation because she felt she had an obligation to pursue the maximum penalties for someone with his level of culpability. (Id. at 73-74). She also testified that Guerra needed her approval before entering into significant plea agreements or significant decisions about cooperation by defendants who (like Williams) were facing substantial sentences. (Id. at 77). When asked whether she would have permitted Williams to proffer information about Jackson's whereabouts, she testified that she would not have done so. (Id. at 83-84). It was her practice to refuse a proffer session if she did not intend to offer that person a plea deal. In Williams' case, because she did not intend to permit him to cooperate, she would not have permitted him to engage in a proffer. (Id.) When asked if, hypothetically, an unconflicted attorney had come in and said:

> you're being misled about Mr. Jackson, we can prove it to you, and we want to tell you about the homicides and [other information that Williams had] . . . Give us the opportunity, Madam U.S. Attorney, listen to us, then make the judgment and – what was possibly the downside of you listening David Williams and his unconflicted attorney, to give him a shot to tell you the truth?

(Id. at 84-85). O'Donnell testified that she would not have permitted that to occur because she believed it would have been acting in bad faith for the government to permit a proffer and use information obtained from Williams when it had no intention of permitting Williams to plea to a sentence of less than life

imprisonment.  (Id. at 85-86).  After hearing her testimony and having the

opportunity to observe her demeanor, the Court found that testimony to be

credible.

O'Donnell's and Guerra's testimony was also consistent with the position

of the government taken after Leonardo was replaced with conflict-free counsel.

Shortly after Greenwald assumed Williams' defense, he approached Guerra and

inquired whether it was possible to resolve the indictment by plea bargain.  The

first conversation occurred in early February 2001.  Guerra told Greenwald that

only a plea involving life imprisonment would be acceptable to the government.

Greenwald approached Guerra a second time in mid-February, and Guerra

reiterated that any plea would require Williams to serve a life sentence, with the

possibility of consideration for his girlfriend, Shawn Jones, and his daughter

Shanique Williams.

A few months later, in Spring 2001, Greenwald's associate, Jacqueline

Ricciani approached Guerra about the possibility of a plea deal.  Guerra again

reiterated that any deal would require Williams to agree to a life sentence.

Guerra also told Ricciani that he was not interested in having Williams cooperate

against any codefendants.  A memorandum prepared by Ricciani to Greenwald

in April 2001 confirms that Guerra expressed no interest in the possibility of

Williams' cooperation against codefendants, or against Leonardo relating to his

involvement with silencers.  Guerra initially expressed some interest in possible

cooperation against Leonardo relating to his role in a homicide, but when Ricciani again approached the subject Guerra expressed no interest. In any event, there was never a discussion of any plea involving a sentence of less than life imprisonment. Nor did Williams ever specifically identify to the government the information that he was willing to provide.

Williams asserts that the government was uninterested in his cooperation because at that point, the information was stale. The Court does not agree. Although Greenwald entered the case as counsel for Williams two years after indictment, a large number of codefendants still had not reached plea deals with the government at that time, including Dawood Naseer and Alvin Jackson, both of whom Williams claims were equally culpable. Likewise, information that Williams now claims he could have provided about various homicides was not stale. That Greenwald was unable to persuade the government to permit Williams to proffer supports the government's claim that it simply did not want cooperation from Williams, whom it perceived to be the most culpable defendant. Indeed, Ricciani testified that she never even advised Guerra of the specific cooperation that Williams could have provided because the government "was so dead set against Mr. Williams having any kind of consideration, regardless of the information . . . ." (See Dkt. 1071, at 108).

Moreover, the government's position (of no deal less than life) was also consistent with its treatment of codefendant Dawood Naseer. From indictment

until almost the date of trial, the government consistently held to its position that only a sentence of life imprisonment was acceptable for defendants Williams and Naseer, and that any benefit from their cooperation would only inure to their loved ones (who were also facing charges). AUSA Guerra repeatedly rebuffed efforts by counsel for both Williams (Greenwald) and Naseer (attorney Glen Murray) to engage in proffer sessions. The record reflects that Naseer's counsel "bugged [Guerra] from almost day one about a plea" (see Dkt. 1041, at 465, Gov't Exh. 114A), but Guerra consistently denied Naseer the opportunity to engage in a proffer.

In mid-July 2001, a few months before the trial was to occur, Naseer's counsel again requested an opportunity to proffer, and Guerra again reiterated that any deal would require Naseer to plead to life imprisonment. (Dkt. 1041, at 465). Naseer's counsel told Guerra that Naseer wanted to talk anyway because Naseer had information about several homicides. Because Naseer was still lower on the scale of culpability than Williams, Guerra agreed to speak to Naseer to see what he had to say, reiterating that any deal would likely require a plea to life, with any benefit flowing to Naseer's two wives who were codefendants. Before doing so, Guerra obtained permission from Kathleen Mehltretter, who had assumed the role of acting United States Attorney for the WDNY USAO following Ms. O'Donnell's departure in May 2001.

Williams agues that the governments' position is not credible because it

offered plea deals to other equally-culpable codefendants, such as Alvin

Jackson and Dawood Naseer. The evidence at the hearing (and at trial) does

not support Williams' contention that he was equally-culpable as Naseer and

Jackson. Jackson was Williams' drug supplier. The government's post-

indictment investigation revealed that Jackson was less culpable than originally

believed. He provided drugs to Williams who then distributed them throughout

Buffalo. He also may have provided guns to Williams. Jackson's role was

essentially a "go-between" or "middle man" between Williams and individuals

that Jackson knew in Florida who could supply large quantities of cocaine. (See

Dkt. 1039 at 139). Another significant factor in the government's decision to

offer Jackson a lighter sentence stemmed from the fact that he was very ill, had

two non-functioning kidneys and had a life expectancy of 8 years.

As among codefendants in this case, Naseer was the closest in culpability

to Williams, and like Williams, the government consistently refused to offer

Naseer a plea of less than life imprisonment. In fact, Naseer's plea agreement

did subject him to a potential mandatory term of life imprisonment, but

anticipated that the government would make an unspecified U.S.S.G. § 5K1.1

motion based upon his cooperation. If the government had later determined that

Naseer was not telling the truth, he would have faced life imprisonment under his

plea agreement and would not have been able to withdraw his plea. Notably,

although Naseer proffered with the government in July 2001, his proffer

agreement was not signed until September 15, 2001, days after the tragic events of September 11, 2001. After September 11ᵗʰ, Naseer, who was Muslim and spoke Arabic, became much more valuable to the government. The record reflects that Naseer did in fact cooperate with authorities investigating terrorism.

Williams next argues that the government's position is inconsistent with its treatment of Calvin Cornelius. Calvin Cornelius was another person who had been represented by Leonardo on federal charges. Cornelius was charged in an unrelated case with, *inter alia*, racketeering, narcotics distribution, and engaging in a continuing criminal enterprise. Like Williams, Cornelius was believed to have participated in at least one homicide.[4] The government did permit Mr. Cornelius to plea to a sentence of 20 years' (as opposed to life) imprisonment. However, AUSA Guerra testified that the decision to do so was motivated by proof problems in the <u>Cornelius</u> case that were simply absent in the <u>Williams</u> case. Guerra explained that about a year or so after indictment, facts developed in the <u>Cornelius</u> case that made if very possible that a jury would disbelieve a key government witness against him. That was simply not the case in the <u>Williams</u>' prosecution where the evidence was stronger and did not rely as much

---

[4] Because this Court did not preside over the Cornelius prosecution, it is difficult to compare their relative levels of culpability. However, evidence indicates that both were large-scale drug distributors who were willing to employ guns and violence to further their drug trafficking activities.

on cooperating codefendants.[5]  Guerra also testified that he believed Williams to be a larger drug dealer and would not have permitted Williams to cooperate against Cornelius and, in any event, there was never a proffer to do so.  The plea deal with Mr. Cornelius did not occur until December 2001, long after Leonardo had been replaced by conflict-free counsel.  Thus, it was not too late for Williams to cooperate against Cornelius if he had useful information and a desire to do so.  That no specific offer of cooperation was made by Williams suggests that either he did not have useful information or was simply unwilling to cooperate against Cornelius.  Moreover, the fact that the government never sought out Williams' cooperation, even after proof problems in its case against Cornelius developed, supports its claim that it was not interested in having Williams cooperate against Cornelius.

In sum, based upon the credible evidence presented at the hearing, the Court finds that even if defendant Williams had been represented by conflict-free counsel at the outset, the only plea offer that he would have gotten is the same plea offer that he did in fact get - a plea requiring him to agree to a sentence of life imprisonment, with benefits flowing to his daughter and girlfriend.  AUSA Guerra did admit that the government would have been willing to let Williams

---

[5]  Evidence against Williams consisted of witness testimony, the seizure of a large amount of cash, wiretap evidence, drugs and drug parapharnelia discovered at Williams' residences and fingerprint evidence tying Williams to the drugs.  In contrast, evidence against Cornelius rested primarily upon witness testimony, with the exception of the seizure of a large amount of money on one occasion.

plead to only one count requiring life imprisonment, as opposed to the eight counts for which he was convicted and sentenced. The Court credits that testimony but finds for the reasons stated below, if that deal had been offered, Williams would not have accepted it.

## II.    Defendant's Willingness to Accept that Offer

Williams testified that he wanted to cooperate from the outset but that Leonardo discouraged him from doing so. He claims that if conflict-free counsel had advised him to do so, he would have been willing to cooperate with the government against Leonardo, Jackson, Cornelius and Naseer. He also would have been willing to provide information about homicides purportedly committed by Jackson, Naseer and Overall together, and one committed by William Byrd.[6]

The Court did not find Williams' testimony to be wholly credible. For example, Williams tried to minimize his role in the conspiracy and to characterize Alvin Jackson and Dawood Naseer as more culpable than himself. He also denied having a drug organization. That testimony was not supported the evidence at the hearing or during Williams' trial. From the outset of the investigation, the government's evidence indicated that Williams was the head of

---

[6]  William Byrd was not a defendant in this case. However, he was a criminal associate of Naseer and Williams and this Court has determined in another proceeding that William Byrd committed two homicides and later bragged about it to Naseer and Williams. Part of Naseer's cooperation involved informing the government of Byrd's role in those homicides.

the drug organization, that Naseer was his second-in-command, and Jackson was Williams' supplier. The evidence at trial supported this assessment and Williams' testimony to the contrary was simply not credible.

Williams also testified that he was not guilty of engaging in a drug conspiracy in 1995, even though he had pled guilty to doing so. This claim of innocence was contrary to his plea of guilty made under oath before Hon. John T. Curtin in 1995.

Perhaps most importantly, the Court did not find credible Williams' claim that he would have been willing to cooperate in exchange for a plea deal. That Williams now believes, in hindsight, that he would have been willing to cooperate with the government does not make it so. The overwhelming evidence indicates that he would not.

As stated, the only plea offer the government would have made would have required Williams to agree to a sentence of life imprisonment, with benefits flowing to his girlfriend and daughter. That plea offer was actually made to Williams after conflict-free counsel entered the case, but Williams rejected it. Greenwald and Ricciani advised Williams of the government's offer of life with benefits to his loved ones, but Williams was not interested. Williams testified that he was only interested in a sentence involving 20 years' imprisonment or less, and Ricciani confirmed that. In contrast, when Nasser was similarly advised of the government's life-imprisonment-only position (several months

after Williams rejected the same offer), Naseer still sought to engage in a proffer with the government, fully aware that any sentence would likely involve life imprisonment.

Williams' counsel argues that "it is of no moment what occurred after new counsel was obtained." (See Dkt. 1091, at 5).  This Court rejects that argument. While the issue to be determined relates to what *would have occurred* if Williams had conflict-free counsel from the outset, Williams' actions after he obtained conflict-free counsel in 2001 are highly relevant to show what he would have done if he had unconflicted counsel in 1999.  There is simply no reason to believe that counsel for Williams would have been any more persuasive if they had been involved in the case back in 1999.  Williams was looking for a sentence of 20 years or less, and the government was unwilling to offer it.  With the exception of information about Jackson and Leonardo, much of the information that Williams now claims he could have provided as cooperation was not "stale" in April 2001.[7]  If Williams was as serious about cooperating as he now claims, he would have sought to sit down with the government and make a proffer notwithstanding the government's steadfast position that any deal would

---

[7]  For example, the information that Williams had about the murder of Goober Bishop by William Byrd was not stale in April 2001.  It was Naseer who served as the government's key witness against Byrd and Naseer had not yet proffered with the government about that information.  Similarly, Williams' information relating to criminal activities by Calvin Cornelius and Dawood Naseer was not stale in April 2001.  Naseer did not proffer until July 2001, and Cornelius did not plead guilty until January 2002.

require a sentence of life.    That Williams never sought to do so, even when trial was imminent, leads this Court to conclude that he would have been unwilling to do that even if he had been represented by unconflicted counsel from the outset.

## CONCLUSION

For the reasons stated, the Court finds if Williams had been represented by conflict-free counsel immediately after indictment, any plea offer would have required him to agree to serve a sentence of life imprisonment.  In exchange for his agreement to plead guilty, the government would have permitted Williams to plead to only one count (requiring life imprisonment) and granted leniency to his girlfriend and daughter.  The Court finds that Williams would not have accepted such an offer and therefore, no agreement would have been reached.  Because no deal would have resulted, the last issue - whether Williams would have been sentenced in accordance with his plea agreement - cannot be answered.

Notwithstanding the foregoing, on a prior occasion the parties agreed with this Court that Williams - who was originally sentenced under the then-mandatory guidelines - must be resentenced under the now-advisory regime.  A status conference to set a new sentencing date will be held on June 23, 2010, at 9:00 a.m.  Mr. Greenwald may appear by telephone at that status conference.

SO ORDERED.

_s/ Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: May 13, 2010